FILED

2005 May-09 PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

05 MAY -9  PM 12: 57

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SAMANTHA BEASLEY-DAVIS, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | **2:03-cv-3222-JHH** |
| THE UNIVERSITY OF ALABAMA | ) | |
| AT BIRMINGHAM  HEALTH | | |
| SERVICES FOUNDATION, PC; | ) | |
| and THE BOARD OF TRUSTEES | | |
| OF THE UNIVERSITY OF | ) | |
| ALABAMA AT BIRMINGHAM, | | |
| | ) | |
| DEFENDANTS. | | |

### MEMORANDUM OF DECISION

On December 3, 2004 Samantha Beasley-Davis (herein sometimes referred to as plaintiff and sometimes referred to as Davis) filed a three-count complaint (Doc. #1) against the "University of Alabama at Birmingham Health Services Foundation, PC" (herein referred to as Heath Services Foundation).  Count One stated a race discrimination claim under Title VII for hostile work environment.  Count Two stated a race discrimination claim under Title VII for disparate treatment.  Count Three stated a retaliation claim under Title VII.  On January 15,

2004 the court granted the December 17, 2004 motion of Davis "to add The Board of Trustees of the University of Alabama at Birmingham" as a defendant. On March 4, 2004 Davis filed an amended complaint (Doc. #9) which is absolutely identical to the original complaint except that plaintiff added "The Board of Trustees of the University of Alabama at Birmingham" (emphasis added) to the caption. The University of Alabama at Birmingham (herein sometimes referred to as UAB) is properly sued by suing "The Board of Trustees of the University of Alabama," and the court views UAB as properly sued even though plaintiff improperly added the words "at Birmingham" in describing such defendant. Both Health Services Foundation and UAB filed answers.

On October 20, 2004 Health Services Foundation filed a motion for summary judgment in its favor. It is undisputed that at no time has Davis been employed by Health Services Foundation, which is a separate and distinct legal entity from the legal entity known as UAB. Based upon such undisputed fact the court granted the motion of Health Services Foundation and dismissed it, with prejudice, as a defendant on December 1, 2004 (Doc. #21).

The court now has before it the February 7, 2005 motion of UAB for summary judgment in its favor (Doc. # 22). Attached to the motion are a memorandum brief in support of the motion, a list of sixteen attached documents

2

identified as Exhibits A-P, and a list of references to attached pages from the

deposition of plaintiff.  In opposition to the motion Davis filed on March 28, 2005

a response (Doc. # 24) consisting of a brief and an evidentiary submission

containing fifteen documents identified as Exhibits A through O.  Pursuant to the

March 1, 2005 order, the motion is now under submission.

Apart from the issue that many of the alleged events occurred more than 180

days prior to the filing of an EEO complaint,[1] the basic ground upon which the

motion is predicated as to all three counts is the inability of Davis to make a prima

facie case as to each such claim.  A prima facie case of racial discrimination under

Title VII for hostile work environment consists of the following five elements:  (1)

the employee belongs to a protected group; (2) the employee has been subjected to

unwelcome harassment; (3) the harassment must have been based on the race of

the employee; (4) the harassment must have been sufficiently severe or pervasive

to alter the terms and conditions of employment and create a discriminatory

abusive working environment, and (5) a basis for holding the employer liable.

---

[1] Davis filed her first EEO complaint on March 20, 2003, and her second EEO complaint on
August 19, 2003. See Exhibit B and Exhibit C of Defendant's Exhibits.  Thus, discrete acts
occurring prior to September 21, 2002 cannot be the basis for her claims under Count Two or
Three, other than to show the state of mind of an actor or decision-maker associated with the
conduct addressed in the count.  Moreover, Davis cannot go back beyond September 21, 2002 for
acts supporting her hostile environment claim under Count One as she has not established a
continuing violation. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Berry v.
Bd. of Supervisors of L.S.U., 751 F.2d 971, 981 (5th Cir. 1983).

3

Borden v. Mendoza, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc). A prima

facie case of racial discrimination under Title VII for failure to promote or transfer

has four elements: (1) that the employee belongs to a protected class; (2) that the

employee, seeking a promotion or transfer, applied for and was qualified for a

position for which the employer was seeking applicants; (3) that the employee was

denied the promotion or transfer; and (4) that another equally or less qualified

individual outside of the protected class received the position. Batey v. Stone, 24

F.3d 1330, 1334 n.11 (11th Cir. 1994). A prima facie case of discrimination under

Title VII for retaliation consists of three elements: (1) the employee participated

in an activity protected by Title VII; (2) that the employee suffered an adverse

employment action; and (3) that there is a causal connection between the

participation in the protected activity and the adverse employment decision.

Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1336 (11th Cir. 1999).

Since UAB, as the moving party, has met its burden of informing the court

and Davis of the basis for its motion, Davis, as the non-moving party, is required

to go beyond the pleadings and by her own affidavits or depositions or answers to

interrogatories and admissions on file designate specific facts showing there is a

genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). A

dispute is genuine "if the evidence is such that a reasonable jury could return a

4

verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

If, as here, the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who, as here, does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993). If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record

5

evidence, overlooked or ignored by the movant, sufficient to withstand a directed

verdict, or the non-moving party may come forward with additional evidence

sufficient to withstand a directed verdict motion at trial based on the alleged

evidentiary deficiency. However, when responding, the non-movant can no longer

rest on mere allegations, but must set forth evidence of specific facts. See Lewis

v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504

U.S. 555, 561 (1992)).

As noted earlier, UAB has satisfied its initial burden under its motion for

summary judgment. Thus, Davis must either point out evidence in the court

record overlooked or ignored by the movant, sufficient to withstand a directed

verdict, or come forward with additional evidence sufficient to withstand a

directed verdict motion at trial based on the alleged evidentiary deficiency, or a

combination of the two. A review of plaintiff's brief, and the fifteen exhibits

attached thereto, considered along with defendant's brief and exhibits, satisfies the

court that Davis has not met her burden. While a few of plaintiff's exhibits may

arguably be beneficial to her, by far the most significant evidence in support of her

claim are the eight pages, single-spaced, comprising her answer to interrogatory 3

from defendant included as plaintiff's Exhibit N with her brief. There, in eighteen

separately numbered paragraphs, she, in chronological order, details each incident

6

that she argues supports her three claims.[2] It is important to emphasize that all of the information set out in paragraphs 1 through 10 of her answer to interrogatory 3 involve events occurring more than 180 days prior to the filing of Davis' first EEO charge on August 20, 2003. While events occurring prior to September 21, 2002 may have some relevance as background, it cannot be considered with regard to the claims stated in Counts One, Two or Three except as relevant to show the state of mind of an actor or decision-maker associated with the conduct addressed in the count. It is equally important to emphasize that Helen Cobb and Christopher Meeks, whose conduct is central to all three of her claims, were employees of Health Services Foundation, not UAB. Following Helen Cobb's retirement in 2001 from her employment with Health Services Foundation as an Administrative Services Associate (assigned to work for Dr. Keith Georgeson in UAB's Division of Pediatric Surgery), Cobb was re-hired June 11, 2001 by Health Services Foundation as a part-time employee with the title of Program Coordinator II. See Exhibit O attached to defendant's motion for summary judgment. Effective December 15, 2001, Health Services Foundation changed Cobb from a part-time

---

[2]  The answer to interrogatory 3, in greater detail, generally follows the thirty-three separate paragraphs in her March 20, 2003 EEO charge. See Defendant's Exhibit B. A copy of her answer to interrogatory 3 is attached to this Memorandum of Opinion as Exhibit 1. With the detailed statement of the facts therein set forth in a manner favorable to her, it is easy to see why plaintiff elected not to submit her deposition as evidence in opposition to the motion.

employee to a full-time employee with her old title of Administrative Services
Associate. See Exhibit P attached to defendant's motion for summary judgment.

Plaintiff's presentation to the court in opposition to the motion for summary
judgment totally fails to demonstrate that she has a prima facie case for any of her
claims or that there is a genuine issue for trial with regard to any of her three
claims. Based upon the undisputed facts, she has neither presented evidence nor
pointed out evidence in the court record which, alone or in combination,
establishes a prima facie case for any of her three claims or would be sufficient to
withstand a directed verdict as to any of the three claims.

Any harassment (even including events occurring prior to September 19,
2002, and events in which employees of Health Services Foundation participated)
falls far, far short of being sufficiently severe or pervasive to alter the terms and
conditions of her employment and create a discriminatory abusive working
environment based upon race, or upon any other criteria embraced in Title VII.

On or about March 27, 2003, through her attorney, Davis expressed to UAB
an interest in transferring to one of several positions.[3] Although it is unclear, the
failure to receive any of these positions may be the subject of her Count Two

---

[3] Because of the proximity of this letter to plaintiff's March 20, 2003 EEO charges, the court
wonders about the purpose of the letter.

8

disparate treatment claim. If this is the basis, it was obviously not covered by her March 20, 2003 EEO charge because the conduct occurred after the charge. Also, it was not sufficiently covered in the August 18, 2003 EEOC charge.

Nevertheless, the court will overlook such deficiency.[4]   But it is absolutely clear that there is simply no evidence from which a jury could conclude (a) that any of the mentioned positions were open or available or (b) that another equally or less qualified individual received the position from UAB.

As to plaintiff's Count Three retaliation claim, it is equally lacking in evidentiary support. There is a total lack of evidence sufficient to create a jury issue on the element of her retaliation claim that she suffered an adverse employment action following her March 20, 2003 or August 18, 2003 EEO charge. Apparently a few months after filing the August 18, 2003 EEO charge Davis quit her employment with UAB, and Davis argues that this "constructive discharge" satisfies the "adverse employment" element. While a constructive discharge will satisfy the requirement in Stavropoulos v. Firestone, 361 F.3d 610, 616 (11th Cir. 2004) that the adverse action "meet some threshold level of substantiality," the evidence before the court falls far short of being "so intolerable

_____

[4] It is possible plaintiff is seeking to redress positions sought by her in 2001 or claimed disparate treatment in pay in 2001. If so, the court will not overlook the 180 day deficiency as to such claims and will simply ignore them.

9

that a reasonable person in [Davis'] position would be compelled to resign."

Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) see also Durley v. APAC, Inc.,

236 F.3d 651, 657 (11th Cir. 2000).

There are no disputes as to any material fact. Indeed this Memorandum of

Decision is, for all practical purposes, based on plaintiff's evidence. Defendant is

entitled to a judgment in its favor as a matter of law because plaintiff has not

established, and apparently cannot establish, a prima facie case for any of her three

claims. One final point should be made. Title VII is not a federal "civility code."

See Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75 (1998). A separate

final order will be entered.

**DONE** this the ___9th___ day of May, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHRN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SAMANTHA BEASLEY-DAVIS            )
                                 )
         Plaintiff,              )
                                 )
Vs.                              )     CASE NO. CV-03-H-3222-S
                                 )
UAB HEALTH SERVICES              )
FOUNDATION AND BOARD OF          )
TRUSTEES OF THE UNIVERSITY OF    )
ALABAMA AT BIRMINGHAM,           )
                                 )
         Defendants.             )

**PLAINTIFF'S EXHIBIT**
_N_

### PLAINTIFF'S ANSWERS TO FIRST INTERROGATORIES

COMES NOW the Plaintiff, Samantha Beasley-Davis, and in response to Defendants, Board of Trustee's of the University of Alabama's First Interrogatories to Plaintiff, and states as follows:

✶    ✶    ✶    ✶    ✶    ✶

**QUESTION**
        3.      Please state the incident, date of the incident, or approximate date, of each of the incidents alleged to have been committed by defendant UAB in your complaint. Please be as specific as possible in your answer.

**RESPONSE:**
1.      In April of 2001, Helen Cobb, Administrative Associate in Division of Pediatric Surgery retired from the University of Alabama. I planned and arranged Helen Cobb's retirement party and also shopped for her gift, a wooden desk set with her name ingrained. After Helen Cobb's retirement from UAB, I began performing the duties of Administrative Associate as well as my regular duties as Patient Care Administrator for Dr. Keith Georgeson, Division Director of Pediatric Surgery. Approximately a month after Helen Cobb's retirement, I expressed my desire

2    EXHIBIT I TO MEMORANDUM OF DECISION
     DATED MAY 9, 2005

to apply for the permanent position of Administrative Associate to Dr. Georgeson. Dr. Georgeson agreed and told me to send my application to Christopher Meeks, Executive Finance Administrator, UAB, Health Services Foundation. I promptly hand delivered my application, the only employee evaluation I ever received in my 8 years in Pediatric Surgery, various job related certificates and resume to Christopher Meeks. I then hired and trained temporary UAB employee Martha Lockard for the Patient Care Administrator job position. Throughout the summer of 2001, I continued to perform the duties of Administrative Associate for Dr. Keith Georgeson except for the Surgery Residency Program. UAB Health Services Foundation hired Helen Cobb on a part-time basis for the Residency Program in Pediatric Surgery.

2.      On/or about May 30, 2001, I spoke with Dr. Keith Georgeson, Division Director, about an increase in salary from $11.40 to $16.50 per hour after learning that Diane Rosato, a white employee, hired in 2001 had a starting salary of $14.85 per hour in the identical job position. Dr. Keith Georgeson had approved the high starting salary for Diane Rosato than what was standard for secretaries. I received the employment records of Diane Rosato from Helen Cobb when she retired from UAB in April 2001.

        I stated to Dr. Georgeson that I had greater job experience, more education, and had been employed by UAB for a longer period of time. Dr. Georgeson agreed to raise my salary to $16.50 in June. However, after a discussion with Christopher Meeks, Dr. Georgeson informed me that he could only raise my salary to $15.25 an hour. Dr. Georgeson promised to increase my salary to $16.25 per hour in October 2002. This never occurred because Dr. Georgeson failed to write a letter of justification. I worked in the position of Administrative Associate from May to October 31, 2001 and my salary was not increased to $15.25 per hour until October 2001. The actions of Dr. Keith Georgeson and Christopher Meeks constitute racial discrimination in the way I was treated, lied to, and denied compensation because there was no discussion with Christopher Meeks or any letter of justification required or needed for Dr. Georgeson to approve a higher starting salary for Diane Rosato, a white employee into the Division of Pediatric Surgery. I was never paid the salary or overtime for May to October working as Dr. Georgeson's Administrative Associate, and was denied the raise in salary because Dr. Georgeson never wrote a justification letter as promised.

3.      On August 2, 2001, I requested by e-mail sent to Joan Wilson, Personnel Officer at UAB, that Martha Lockard be hired as a permanent UAB employee. Joan Wilson informed me by telephone on August 3, 2001, that there was a problem with this request because I still occupied the job position Mrs. Lockard was in on a temporary basis, and that I should talk to Christopher Meeks about this. Christopher Meeks, Executive Finance Administrator, UAB Health Services Foundation, phone number 934-6380, informed me that Martha Lockard could not be hired permanently because I still occupied the position and that Helen Cobb would be hired November 1, 2001 back into the position of Administrative Associate in the Division of Pediatric Surgery.

        After waiting four months for my application for the position of Administrative Associate to be approved I was told by Christopher Meeks that there could not be two Administrative Associates in the Division of Pediatric Surgery and that he was holding the job position open until November 2001, so Helen Cobb could be rehired. I told Christopher Meeks, "this action was not fair, I had waited on approval of my application and worked in this position for 4 months. Christopher Meeks reply was "well it's already done." These actions of Christopher Meeks, Dr. Keith Georgeson, and Joan Wilson constitute intentional racial discrimination and were violations of UAB Personnel Policies and Procedures.

3

4.    On August 6, 2001, I spoke with Joan Wilson, UAB Personnel Officer. I asked what could I do about not being hired into the position of Administrative Associate, and how could Christopher Meeks and Dr. Georgeson hold a job position open for a person that had retired from the position in April 2001? Joan Wilson's reply was that they (Christopher Meeks and Dr. Georgeson) could do whatever they wanted to do. Joan Wilson never mentioned that the actions of Christopher Meeks and Dr. Keith Georgeson were in violation of UAB Personnel Policy #124 or even that such a policy existed. I asked her what am I suppose to do now that Martha Lockard expected to be hired and I did not have a job position since Helen Cobb was to be rehired? Joan Wilson said that I was authorized to create a new job position for myself "Office Associate II," and that she would submit the necessary documents and send me information to help me create the new position in the Division of Pediatric Surgery (I have these documents). In April of 1999, I was not allowed to create this job position by UAB according to Joan Wilson and Helen Cobb, and was paid extra money from Pediatric Surgery Project account with Children's Hospital by Dr. Georgeson to keep me from transferring to another department within UAB. Now at this time according to Joan Wilson, I would not have any problems from UAB and had already been authorized to create this new job position because Helen Cobb was to be rehired back into the position of Administrative Associate after retiring from UAB. The document that Joan Wilson sent to me was dated July 31, 2001, but the first discussion I had with her about this matter was not until August 3 and on August 6, 2001.

       The actions of Christopher Meeks, Dr. Keith Georgeson, and Joan Wilson constitute intentional racial discrimination in equal employment opportunity, promotion and compensation. The above actions constitutes disparate treatment because I was denied promotion so that Helen Cobb, a white employee could be rehired after retiring from UAB.

5.    On November 8, 2001, Helen Cobb, Administrative Associate came into my office in the Division of Pediatric Surgery at Children's Hospital. Helen Cobb angrily demanded to know "who authorized me to hire Martha Lockard." Her tone of voice was disturbing. I answered that Dr. Keith Georgeson, Division Director; Pediatric Surgery had authorized Martha Lockard's permanent employment after six months of temporary employment. Helen Cobb asked if I had any proof of this. I replied, "yes I did." Helen Cobb stood there in my office door for a few minutes more then turned and walked out.

6.    On November 14, 2001, Helen Cobb, Administrative Associate came into my office in the Division of Pediatric Surgery at Children's Hospital with a memo I had given to her as instructed by Dr. Keith Georgeson. Helen Cobb in a hostile voice asked me what did I mean by telling her to come up with a plan? I answered that the instructions came from Dr. Georgeson; I only wrote on the internal memo what Dr. Georgeson told me to write. Helen Cobb said very hostile "well don't tell me how to do my job," and walked out of my office.

7.    On or about November 29, 2001, Helen Cobb, Administrative Associate came into my office in the Division of Pediatric Surgery at Children's Hospital with various complaints about the work study students I had hired. I told her that the students had told me that they were quitting at the end of that year because of the animosity they were receiving from her. I also told her that Martha Lockard, Office Service Specialist III (Patient Care Administrator) had spoken to me about the way she was being harassed by Helen Cobb and this was the reason for the angry confrontation that took place in the office between Helen Cobb and Martha Lockard a few days before. Martha Lockard had run screaming and crying from Helen Cobb's office telling her to leave her alone. That she did not hire her and she was sick of her harassing her and telling her to find another job. Martha Lockard was crying and begging me to keep Helen Cobb off of her back. Martha Lockard said that Helen Cobb treated her one way in front of people and very

4

nasty when she was alone with her. Martha Lockard would not come into the office during regular hours because Helen Cobb was in the office. Helen Cobb asked me to come outside with her to smoke a cigarette and I told her "no." Helen Cobb looked at me in an intimidating way and walked out of my office. On December 3, 2001, Martha Lockard called me at the office and submitted her resignation from her job position. Helen Cobb's behavior was offensive and hostile toward me and to the employees that I had hired. Helen Cobb's behavior created an invidious atmosphere in the office for me.

8.      On February 25, 2002, Helen Cobb, Administrative Associate came into my office in the Division of Pediatric Surgery at Children's Hospital and sat down in one of my office chairs in front of my desk. Helen Cobb said to me very hostile that she had been working for Dr. Keith Georgeson for a long time. I made no reply to this statement and waited for her to continue if there was a point she was trying to make. Helen Cobb then stood up and walked out of my office. I later left my office to go to the bathroom room. When I returned to my office, my office lights had been turned off. This kind of foolishness continued to occur throughout the year whenever I walked away from my office.

9.      After Martha Lockard resigned on December 3, 2001, Helen Cobb, Administrative Associate in the Division of Pediatric Surgery at Children's Hospital hired and trained Shalonda Hall as a temporary employee while I was away from the office on Christmas vacation. I worked very closely with the person in this job position and Ms. Hall was a total disaster in this job position. Whenever I brought this fact to Helen Cobb's attention she would complain and harass me about something she said that Martha Lockard did wrong in the position. I finally went to Dr. Georgeson about the situation and Ms. Hall was dismissed after about three months later. I then had to come into the office on the weekends to straighten out Dr. Georgeson's medical charts.

        Rose Johnson (Africa American) was then hired as a temporary employee in the position in/or about April 2002. I trained Rose Johnson in the position. Rose was an excellent worker, intelligent, energetic, always on time, pleasant and efficient. Rose was sensitive to the needs and concerns of the patients, Dr. Georgeson's busy traveling schedule and we worked well together organizing Dr. Georgeson's extensive duties as Director and Surgeon-in-Chief.

        Several months later when Helen Cobb stated that the office was hiring permanently for the position, I told Rose to apply. Helen Cobb came to me and told me that Dr. Georgeson wanted to interview a Janet Dancer, an individual from outside the UAB system. After reviewing both Rose and Janet's resumes, I felt that Rose was the better-qualified person. I stated this to Helen Cobb. Rose Johnson had a degree in Microsoft Information Systems, which covered a wide range of skills. Rose was a fast learner and efficient. Since Helen Cobb scheduled Janet Dancer's initial interview at 5:30 pm in the evening after the office had closed I did not meet her. I asked Helen Cobb about this since I would be working very closely with whoever was in this job position. Helen Cobb informed me a week later that Dr. Georgeson wanted to hire Janet Dancer. I expressed my regrets because I felt that Rose was the best person for the job. Helen Cobb told me that Janet Dancer had a strong background in the software program PowerPoint. I stated that Rose Johnson had a MIS degree, which gave her a strong background in all software programs including PowerPoint. Helen Cobb then told me that Rose Johnson had been hired in another job and that she was more interested in computers.

        About a week later I asked Rose Johnson when would she be starting her new job? Rose expressed surprise and told me that she did not have a new job. I expressed my concerns to Dr. Georgeson about the way Rose had been treated and overlooked for the job. Dr. Georgeson told

5

me that Helen Cobb had told him that Rose was not interested in the job. I spoke to Helen Cobb concerning this and she immediately started taking Rose Johnson around to different departments in Children's Hospital trying to find her a job.

Helen Cobb also denied to Rose Johnson that she had told me that Rose had another job. Rose Johnson was allowed to work in the department as a temporary employee until August 31, 2002. Janet Dancer was hired as a permanent employee on August 1, 2002, and was a close friend of Andrea Darby another white employee in the office.

Helen Cobb allowed Janet Dancer (a new employee on six months probation) to leave the office for 3 to 4 hours at a time to pick up two daughters and bring them to the office 2 to 3 times a week. This behavior continued until on December 18, 2002, I called Joan Wilson, Personnel Officer, at UAB to ask her if these actions were allowed and to complain about the working environment I was being subjected to.

10.     On September 12, 2002, I requested a patient chart from Tiffany Robinson, file clerk in the Division of Pediatric. Several hours later that day Tiffany came into my office and asked me was there anything wrong? I asked her why had she asked me this? Tiffany said that Helen Cobb came to her and wanted to know what was I talking to her about and why did I request the patient's chart. I want to Helen Cobb and told her that I had the right to ask Tiffany about Dr. Georgeson's patients and to talk to whomever I wanted to. I told her that she was continuously harassing me. I then left out of the office suite and when I returned the patient chart I had requested was missing out of my office. I also had several travel folders for Dr. Georgeson to go missing from my office. I cannot say what happened to them because this would happen when I was away from my office.

11.     On/or about September 24, 2002, Connie Jones, Receptionist for Division of Pediatric Surgery typed up a list with all the employees' names and titles in the pediatric surgery division. After I reviewed my list I took it back to Connie and told her my title was wrong. Connie had listed Janet Dancer and I with the same job title. Connie informed me that this was the job title Helen Cobb had given her for me. I again stated that the title was wrong. Helen Cobb was standing right there at Connie desk during this conversation. Connie reply to me was "what different does it make we are all secretaries and she thought the list was nice." I stated the list is nice but my title is wrong and I would like it corrected. Connie then proceeded to pull all the copies of the list from the staff mailboxes and tear them up. Helen Cobb stood there while this incident took place and patted Connie on the back and said to her "you did a good job."

12.     On October 2, 2002, Dr. Keith Georgeson, Division Director of Pediatric Surgery in the Children's Hospital asked me to initiate setting up an account for funds received from research and various drug studies. The account was to be accessible to Beverly Haynes, RN in the Division of Pediatric Surgery. I sent the monies totaling over $19,000.00 dollars to Lisa Cosmas, Administrative Associate, in UAB Health Service Foundation. Several days later Helen Cobb, Administrative Associate, Division of Pediatric Surgery in Children's Hospital came to my office and angrily demanded that I give her the checks right away. I told Helen Cobb that Dr. Georgeson had asked me to set up a new account and I had sent the checks to Lisa Cosmas to initiate the new account. Beverly Haynes, RN and I spoke to Dr. Georgeson about this harassment. Dr. Georgeson stated that he indeed wanted me to setup the new account and that monies from an old account that Helen Cobb had setup in the past were to be included in this new account.

6

On October 18, 2002, Lisa Cosmas called me requesting additional documents to set up this account. Dr. Georgeson told me to get the necessary papers from Beverly Haynes. Beverly said that Helen Cobb had asked for the papers. I called and e-mailed Lisa Cosmas on October 22, 2002 to inform her about the situation. I explained to her that Helen Cobb had been harassing me about the checks and the setting up of this new account and I did not know what happened to the monies in the old account because Helen Cobb had completely taken over what Dr. Georgeson had instructed me to do. Helen Cobb was continuingly harassing me and interfering in my performing my work duties.

10.     January 6, 2003, Dr. Keith Georgeson, Division Director of Pediatric Surgery left me instructions about a trip he planned to Chicago. Helen Cobb, Administrative Associate in Division of Pediatric Surgery had Janet Dancer, Office Service Specialist III, e-mail me about this same trip. There was no reason for Janet Dancer to e-mail because I already had instructions from Dr. Georgeson. I e-mailed Janet Dancer for clarification and the return e-mail came from Helen Cobb. The wording of the e-mail was nothing more than harassment. Helen Cobb and I both have access to Dr. Georgeson's scheduling calendar. When Dr. Georgeson was in the office, Helen Cobb would constantly go into the calendar and schedules different events for Dr. Georgeson then call and inform me. When Dr. Georgeson was traveling, Helen Cobb continuously called me to change this or add that to the scheduling calendar. Helen Cobb could have easily avoided this constant harassment about changes in the calendar since she had access to the calendar.

11.     On January 7, 2003, Helen Cobb, Administrative Associate in the Division of Pediatric Surgery at Children's Hospital came into my office and demanded that I make room for some files that she had packed in boxes. I told her that I did not have any room in my office for more files and that I did not use them. Helen Cobb replied that Dr. Georgeson asked her for the files all the time. I replied that if Dr. Georgeson asked her for the files all the time then she should be the one to keep them. Helen Cobb then angrily replied "well you just get up and help unpack the files from the boxes." I made no reply because if Helen Cobb needed help in unpacking these boxes, we had several work-study students in the office to help her. Helen Cobb then proceeded to place multiple boxes in front of my office door blocking my entering and leaving my office while she moved into another office. There was no need for this action since Dr. Georgeson's office was empty because he was away from the office on business.

I then called Joan Wilson, Personnel Officer, UAB Surgery Office, and explain to her that I was continuously being harassed, subjected to an intimidating and offensive working environment and having my work constantly interfered with by Helen Cobb and whoever she enlisted to help her with this offensive harassment. I told Joan Wilson that Helen Cobb had created an intimidating, harassing, offensive and stressful working environment for me. Joan Wilson informed me that I should formalize my complaints in a letter outlining the harassing actions against me. I told Joan Wilson I wanted to talk with Dr. Keith Georgeson, Division Director when he returned from his trip before I did this hoping that it could be straighten out or settled.

12.     On Wednesday, January 8, 2003, I left the office early. Connie Jones, Receptionist for Division of Pediatric Surgery transferred my phone extension to her telephone. My legal counselor (Terry Philpot) called me on the job that day after I had left the office. When I spoke with her later that evening, she asked me "what in the devil is going on in your job." Terry proceeded to tell me how Connie Jones had asked her all kind of questions about why she had called me and when Terry told her that it was a personal call, Connie in a very nasty voice told her that if it was a personal call then she should call me at home. Connie Jones talked constantly

7

on the phone with personal calls and had no right to treat my counselor with such disrespect or question her as to why she had called me. Connie Jones behavior was offensive and insulting to me. I decided to proceed with the formal letter of complaint to Joan Wilson. Because of Joan Wilson's involvement in the discriminatory deception of the rehiring of Helen Cobb, the process of my job creation, dispute over my raise, and being under the authority of Christopher Meeks, Executive Finance Administrator, UAB Health Service Foundation, I cautiously outlined the letter of formal complaint to her. Since I had never worked in a job position (25 years of employment) where I was subjected to harassment or discriminatory actions, I was unaware that I should include the fact that I was being subjected to these harassing and discriminatory actions because I was the only African-American administrative person in this office suite, which was obvious. I hand delivered the complaint letter to Joan Wilson on the morning of January 9, 2003.

13.     On Thursday, January 9, 2003, after enduring one year of discrimination, lies, and consistently being harassed by Helen Cobb, I went to Dr. Keith Georgeson, and expressed my feelings about my work environment. I explained to Dr. Georgeson that the working conditions were onerous and abusive and I did not want to continue to work in such a hostile environment or be subjected to offensive behaviors by Helen Cobb and the other individuals she enlisted to help with her harassment and discriminatory actions. Dr. Keith Georgeson said that he would talk to Helen Cobb and get back to me with a solution.

14.     On Friday, January 10, 2003, right before I was leaving the office for the day Dr. Georgeson asked me to come into his office and close the door. We again discussed the situation concerning Helen Cobb. Dr. Georgeson told me that he had consulted Mrs. Georgeson, his wife about my complaints because he valued her opinion, and the nurse I worked closely with Debra Duke, RN in Division of Pediatric Surgery. Dr. Georgeson said Debra Duke said that she did not know anything about the situation. I told Dr. Georgeson that this was true and that I felt that maybe he had talked with Mrs. Georgeson about the problem from the way she looked at me earlier in the day when she was in the office. Dr. Georgeson said that he could see that I was unhappy. I told him that I was very unhappy because I could not understand the bad attitude, harassment, and lack of respect being directed at me by Helen Cobb. I told him that I had started to put in for job transfer. Dr. Georgeson asked me not to make any decision and to let him think about the situation over the weekend. Dr. Georgeson said that he would talk with me again on Monday. Dr. Georgeson said that if I still wanted to transfer out of the office after we talked he would be happy to assist me. I thanked Dr. Georgeson and left out of his office.

15.     On Monday, January 13, 2003, I did not see Dr. Georgeson until about 4:30 pm that evening right before leaving for the day. Dr. Georgeson came into my office and closed the door. Dr. Georgeson said that he had talked with Helen Cobb and did not see any solution to the problem because it was a bunch of "he said, she said," and now Connie Jones was also involved in the situation. I reminded him that Connie Jones involved herself when she transferred my telephone extension to her phone extension and spoke the way she did to Terry Philpot who I had consulted for legal advice about my job situation. I told Dr. Georgeson that this was not "he said, she said," that I had documented proof of what I had discussed with him. Dr. Georgeson's reply was "well maybe fifteen years ago he could have solved the problem but now he felt that it would be best if I resigned my job position." I asked Dr. Georgeson was he asking me to resign? Dr. Georgeson said that he was asking me to resign. Dr. Georgeson said that I could put in my two weeks notice or I could leave right at that moment if I wanted too, and that he would even talk with my lawyer.

8

I went to Dr. Georgeson's office and I stated to Dr. Georgeson that I did not want to resign. I told Dr. Georgeson not to resign my job position under any circumstance but if he would like to fire me, that I was in his office for him to fire me. Dr. Georgeson asked me "well what are you going to do?" I told Dr. Georgeson that I was going to do what my legal consultant had advised me to do. Dr. Georgeson said "well fair is fair," and that was the end of our conversation. I walked out of his office and prepared to leave the office suite for my evening math class. Helen Cobb stood just inside a secretary's office in the long hallway peeking around the wall watching me as I left the office. On Tuesday, January 14, 2003 I sent Joan Wilson an e-mail outlining the events that had transpired between Dr. Georgeson and myself.

Dr. Keith Georgeson's derogatory remarks and actions implied that I was lying about my work environment and the harassment from Helen Cobb because I was African-American, and that Helen Cobb and Connie Jones were telling the truth because they are white.

16.     On March 10, 2003, Helen Cobb called a staff meeting with all the secretaries in attendance, and Joan Wilson. Dr. Georgeson was out of town on business when this meeting was held. Helen Cobb presented these documents that she said was written by Dr. Georgeson stating new office policies and procedures. Also included was a job position questionnaire. I did not see Dr. Georgeson's signature on any of these documents and refused to sign these papers. I also refused to fill out the job position questionnaire since I was the only one at this meeting who job description had changed since Helen Cobb's retirement in April 2001, and return to UAB in November 2001

When Dr. Georgeson returned to the office, I asked to speak with him about these documents. I showed the documents to Dr. Georgeson and asked him did these documents and instructions come from him without his signature. Dr. Georgeson told me that UAB's lawyer had advised them to do this meeting but that he was told not to discuss or talk about any legal actions. I told Dr. Georgeson that since my job position was the only position in question that I refused to sign any of these documents and that I would not fill out another job description and had sent Joan Wilson an e-mail advising her of the reasons behind my refusal to sign any of these documents. I told Dr. Georgeson that the harassment is continuing and that I would forward any documents given to me by Helen Cobb or him to my lawyers.

17.     Helen Cobb, Administrative Associate, Division of Pediatric Surgery allowed Janice Dancer, a white employee, Office Service Specialist III, Division of Pediatric Surgery, (a new employee on six months probation) to leave the office for 3 to 4 hours at a time to pick up two daughters and bring them to the office 2 to 3 times a week. Janice Dancer was allowed to leave the office on August 15, 16, 23, 27, 28, 2002, September 12, 13, 19, 24, 26, 2002, October 9, 17, 18, 2002. Janice Dancer was given a vacation day on November 26, 2002 by Helen Cobb when she had no official vacation time. Janice Dancer left the office on December 13, 2002, at 4:00 pm, and Monday, December 16, 2002, for several hours. On Tuesday, December 17, 2002, Janice Dancer left the office at 9:30 am and returned at 11:00 am, and left again at 2:50 pm for the day. This behavior continued until on December 18, 2002, I called Joan Wilson, Personnel Officer, at UAB to ask her if these actions were allowed and to complain about the working environment I was being subjected to. Janice Dancer left the office Wednesday, December 18, 2002 at 9:15 am and was absent from work on December 19, 2002.

18.     On May 14, 2003, Helen Cobb, Administrative Associate came into my office demanding that I document a sick day I had taken on May 2, 2003 on my timesheet for the period of May 4-17, 2003. I asked Helen Cobb if all time taken off by other employees are documented after time sheet is turned in. Helen Cobb replied "yes."

9

19. On June 25, 2003, I e-mailed Joan Wilson and attached a document showing falsification of timesheet with overtime accumulated by Janice Dancer for pay periods of October 23, 2002, November 6, 2002, November 20, 2002, December 4, 2002, December 18, 2002, and February 26, 2003. On July 21, 2003, Joan Wilson called me to tell me that Christopher Meeks, Executive Finance Administrator, UAB Health Services Foundation wanted to meet with me the next day. This meeting took place in Christopher Meeks' office on July 22, 2003 at 10:00 am. Christopher Meeks, Joan Wilson and myself were presence. Christopher Meeks said that the charge of falsification of time sheets by Janice Dancer and Helen Cobb had been investigated and because of information that I am not knowledgeable about that all the overtime accumulated by Janice Dancer while she was on six-months probation checked out. I asked Christopher Meeks how could this have checked out when Janice Dancer was on 6 months probation and being allowed by Helen Cobb to leave the office for 2 to 3 hours on a daily basis to pick up her daughters and bring them back to the office, and also taking full days off? You can only get overtime after working 40 hours and if there had been an investigation into this falsification of timesheets why was I not included or asked any questions about the times I documented Janice Dancer being off from work since I made the charge of falsification of timesheet?

Christopher Meeks starting yelling that it checked out and it was none of my business anyway. Nobody sends anything about me down there. I told Christopher Meeks, that's because they don't have anything to send down there about me and it became my business when I am told by Helen Cobb to document my sick time on my timesheet and Janice Dancer is allowed to accumulate all of this overtime while taking hours and days off from the office while she was on six-months probation and had no official sick or leave time.

Christopher Meeks yelled "who did I think I was to keep track of somebody's timesheet, that was Helen Cobb's job and how could I see what Janice Dancer was doing anyway since her office was at one end of the suite and my office at the other end?" I told him that I was not keeping track of anybody's timesheet but I did document the times that Janice Dancer took off because of all the other incidents that was happening to me in the office and that Janice Dancer's office was right next to mine and I could clearly see whenever she left and returned to the office.

Christopher Meeks yelled "you are keeping track of time sheets and it's none of your business" and threatened me by saying if I sent any more information to my lawyers about my discrimination charge against UAB and certain individuals that he would take disciplinary actions against me. Christopher Meeks said that my lawyers could subpoena any information that they needed. Joan Wilson then stepped in taking me by the arm and saying she thinks that enough had been said, leading me out of Christopher Meeks' office.

This action by Christopher Meeks, Executive Finance Administrator, UAB Health Services Foundation and Helen Cobb, Administrative Associate, Division of Pediatric Surgery constitutes disparate and discriminatory treatment. Janice Dancer, a white employee was allowed to accumulate overtime by falsification of her timesheet with the approval of Helen Cobb, a white employee. No actions were taken against Helen Cobb or Janice Dancer but I was yelled at and threatened by Christopher Meeks.

## QUESTION

4. Please state the incident, date of the incident, or approximate date, of each of the incidents alleged to have been committed by Dr. Georgeson in your complaint. Please be as specific as possible in your answer.

## RESPONSE:

10